UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------x
DONOVAN BYFIELD,

                    Petitioner,

       - against -

J. CONWAY, Warden,
Attica Correctional Facility,

                   Respondent.
--------------------------------x

06 Civ. 6405 (GBD) (DFE)

<u>REPORT AND RECOMMENDATION</u>
<u>TO JUDGE DANIELS</u>

DOUGLAS F. EATON, United States Magistrate Judge.

Donovan Byfield's habeas petition challenges his murder conviction after a 2001 jury trial before Justice Joseph Fisch in Supreme Court, Bronx County.

Byfield was represented by retained counsel Matthew Metz at trial.  He has been represented by retained counsel Edward Hamlin during the direct appeal and during this habeas proceeding.

On March 29, 2007, Assistant District Attorney Rither Alabre filed an opposing affidavit, which annexed his memorandum of law and Exhibits 1-19.  (I shall refer to certain of those exhibits as "Exh. __.")  Mr. Hamlin responded with a 16-page reply dated May 24, 2007.  On June 4, 2007, I heard oral argument from Mr. Hamlin and Mr. Alabre.

For the reasons discussed below, I recommend that Judge Daniels deny Byfield's habeas petition.

FACTUAL AND PROCEDURAL BACKGROUND

The following facts were undisputed.  On July 4, 2000, three friends who were residents of Waterbury, Connecticut happened to be in an apartment building at 2175 Reeds Mill Lane in the Bronx. In or around a stairwell, one of the friends (Jason Higgins) was shot in the leg, a wound that proved to be fatal.  He was bleeding from his femoral artery when his two friends knocked on the door of a tenant, who called 911 at 1:28 p.m. at their request.  (Tr. 1719.)  The two friends stayed with the victim. The police arrived, interviewed the two friends, and later requested one of them (Christopher Matthews) to turn over his cell phone to them; he did so.  Telephone company records showed as follows.  There were several calls between the Matthews cell phone and defendant's cell phone on July 2, 3 and 4, with the last call at 12:33 p.m.  (Tr. 1529.)  At 2:06 p.m., at defendant's request, Nextel changed defendant's cell phone number and billing address.  (Tr. 339.)

At trial, there were several prosecution witnesses, including the third friend Keith Ligon, but the most important prosecution witness was Matthews, who testified at Tr. 92-317.

Matthews testified that defendant had lured him to the Bronx with an offer to sell him 2 kilograms of cocaine, for an initial down-payment.  The remainder was to be paid at a later date. Matthews had accepted the offer; he and his two friends had

driven to the Bronx with $7,000 in cash.  Defendant eventually directed them to 2175 Reeds Mill Lane, where defendant and an accomplice stole the $7,000; in the process, defendant shot Higgins.

Defendant testified as follows.  He confirmed that he had arranged on July 2, 3 and 4 to meet with Matthews on July 4.  He claimed that the subject matter of their last conversation, on July 4 at 12:33 p.m., was that Matthews would not be able to come that day but he would come that weekend (July 7-8).  (Tr. 1523-29.)  Defendant had no explanation for why Matthews wound up at 2175 Reeds Mill Lane -- a building where defendant had lived until 1994, when he moved to a different Bronx neighborhood. (Tr. 1410-11.)  He claimed that the purpose of the canceled meeting was to deliver two items that defendant had recently brought from Jamaica for Matthews -- spices and a package from a relative.  He offered no explanation for why he never again attempted to contact Matthews.  He testified that it was just a coincidence that he changed his cell phone number and billing address on July 4 around the time of the homicide; he said his wife had complained that a girlfriend was calling him at that number.  He estimated that it was about 1:20 p.m. when he called a Nextel distributor to make the changes, although it took Nextel until 2:06 p.m. to effectuate the changes.  (Tr. 1463-70, 1543-47, 1606.)

According to defendant, it was also a coincidence that he flew to Jamaica on July 23; he denied being aware that police had chased his car on July 22.  (Tr. 1479-83, 1572-73; compare Tr. 934-38.)  He said he first learned that he was wanted by the police in mid-August.  He then flew from Jamaica to Baltimore as Anthony Byfield, using his middle name rather than his first name.  (Tr. 1564.)  He testified that he was planning to go to New York and contact a lawyer about the homicide charge, but he was arrested at the Baltimore airport.  (Tr. 1493-95, 1566.)

In my view, the jury's main task was to compare the credibility of Matthews's version with that of defendant's version.  Less significant was the testimony of the other defense witnesses (three supplied evidence of alibi and two supplied what might be called quasi-alibi).  All of the defense witnesses testified that they were unaware, until more than a month after the homicide, that the police were seeking defendant as a suspect in a July 4 homicide.  Thus, for more than a month, the defense witnesses had no reason to remember the exact times when they had seen defendant on July 4.  This necessarily weakened the reliability of their testimony.  Tameka Byfield did have an exact time, because she had the billing record of a phone call that she made to the family home at 1:32 p.m., but a key issue was whether defendant was the person who had answered that phone call.  She said he was, but her sole basis was her memory (and her memory

- 4 -

had been unprompted for the first month after her call).

On July 31, 2001, the jury found Byfield guilty of murder. He was sentenced by Justice Fisch to life imprisonment without parole.

In June 2002, Mr. Hamlin filed an appellate brief for Byfield.  (Exh. 4.)  On May 22, 2003, Byfield filed a <u>pro se</u> motion asking Justice Fisch to vacate the conviction, on the ground that trial counsel had been ineffective.  (Exh. 1.) Assistant District Attorney Nhu P. Nguyen sent Justice Fisch an opposing affirmation on August 14, 2003.  (Exh. 2.)  On September 17, 2003, Justice Fisch denied the motion.  His opinion (Exh. 3) noted that the motion's factual allegations were matters of record and were reviewable on direct appeal.

With permission from the Appellate Division, defendant filed a <u>pro se</u> supplemental brief (Exh. 8), in which he pursued the claim that the trial counsel had been ineffective.  ADA Nguyen filed a brief (Exh. 9) responding to Mr. Hamlin's brief and also to the <u>pro se</u> brief.  On February 15, 2005, the Appellate Division unanimously affirmed Byfield's conviction.  *People v. Byfield*, 15 A.D.3d 262, 790 N.Y.S.2d 434 (1st Dep't 2005). Both Mr. Hamlin and defendant wrote letters seeking leave to appeal.  (Both at Exh. 11.)  Judge Victoria A. Graffeo of the New York Court of Appeals denied leave.  (Exh. 12.)

On April 22, 2006, defendant filed his second <u>pro se</u> motion

before Justice Fisch, again claiming that his trial counsel had
been ineffective.  (Exh. 13.)  ADA Nguyen opposed this motion on
May 23, 2006.  (Exh. 14.)  During the pendency of the motion,
defendant filed a supplemental pro se motion (Exh. 16).  On
August 23, 2006, Mr. Hamlin filed the instant habeas petition in
our court.  On December 18, 2006, Justice Fisch denied the
motions pending before him; his decision (Exh. 15) said:  "Both
of these claims were addressed by the Appellate Division on the
defendant's direct appeal and denied on the merits."

DISCUSSION

Docket Item #1 consists of Mr. Hamlin's 3-page petition plus
his 42-page memorandum of law.  Both documents, on their first
page, list ineffective assistance of trial counsel as a stand-
alone Ground 4.  But the memorandum of law discusses this only as
a sub-argument made under Ground 2 (prosecutorial misconduct).
(See Pet. Memo, pp. 33-35, under the heading "Ineffective
Assistance of Counsel Overcomes Procedural Bar to Preservation
Alleged by Appellate Division.")  Accordingly, I will discuss the
complaints about Mr. Metz as a sub-argument under Ground 2.
However, I now make the following preliminary comment.

The only complaint about Mr. Metz is that he did not object
to some trial events that Mr. Hamlin claims were objectionable.
In my view, as will be seen, those events did not hurt the
defense case, and it was quite reasonable that Mr. Metz did not

object.  The entire trial transcript shows Mr. Metz to be a
highly competent attorney.  He delivered a summation that made a
very cogent case for acquittal despite three eyewitnesses plus
damning circumstantial evidence.


    Ground 1: Intent to kill

    Ground 1 contends that no rational trier of fact could have
found, beyond a reasonable doubt, that the shooter intended to
kill the victim.  Such intent was a necessary element of first-
degree murder.  (Tr. 1802.)  The jury did not reach the counts of
second-degree murder, which included depraved indifference (Tr.
1806-09) and felony murder (Tr. 1809-10).

    It was undisputed that the victim suffered four bullet
wounds, that none was in the head or torso, and that death was
caused by a bullet wound to the main artery of the leg.
Defendant has always denied being the shooter; he gave no
evidence that the shooter intended only to disable, not kill.
Nevertheless, he now argues that such an inference was so
compelling that any rational juror would be obliged to find a
reasonable doubt as to whether the shooter intended to kill.  The
Appellate Division held: "Defendant's homicidal intent could be
readily inferred from the numerous shots he fired at the victim,
wounding him four times.  The evidence does not support a
conclusion that defendant merely sought to disable the victim."

That was clearly not an "unreasonable application" of the pertinent decision of the U.S. Supreme Court, *Jackson v. Virginia*, 443 U.S. 307 (1979), which imposes a heavy burden on a defendant who seeks to overturn a jury's finding.  Accordingly, 28 U.S.C. §2254(d) forbids granting habeas on Ground 1.

<u>     Background for Grounds 2 and 3</u>

Grounds 2 and 3 do not involve any prosecution witness, nor do they involve the handling of defendant's testimony.  Instead, they pertain only to the handling of the testimony of the other defense witnesses, three of whom supplied alibi evidence and two of whom supplied what might be called quasi-alibi evidence.  Those five witnesses were relatively unimportant compared with defendant's testimony.

Byfield's first retained attorney was Robert Kramer; on October 5, 2000, he filed a timely Notice of Alibi.  A copy of it is annexed at the end of this Report and Recommendation.  It tersely stated that defendant was "[i]nside and in front of" the family's house at 4441 Baychester Avenue when the crime was allegedly committed.  It listed five alibi witnesses -- defendant's mother, father, wife, brother-in-law, and a friend.

Prior to the trial, the defendant and his family replaced Mr. Kramer with another retained attorney, Matthew Metz.  During jury selection, Mr. Metz orally added another alibi witness --

defendant's sister Tameka Byfield.  The prosecutor (Karen

Yaremko) raised no objection. (Docket Item #12, 7/2/01 Tr. 29-

31.)  ADA Yaremko apparently did not interview any of the defense

witnesses.  So it is unsurprising that she assumed the defense to

be claiming that, in the early afternoon of July 4, defendant was

at a family gathering such as a barbecue or cookout.  But the

Notice of Alibi did not contain such a claim; nor did Mr. Metz's

opening statement, which merely said:

> ... You'll hear from his wife Jackie ... and other
> people, that on July 4th, 2000, at 1:35 in the afternoon it
> was a holiday, he was off from work, and he was with his
> family.

(Docket Item #13, 7/16/01 Tr. 33.)

It turned out that Tameka was the first defense witness to

testify before the jury.  She did not actually see the defendant

during the crucial hour before the 911 call at 1:28 p.m., and

therefore one might call her a quasi-alibi witness.  However, her

testimony was corroborated by her phone records.  (Tr. 851-54,

975-79.)  At 1:32 p.m., she had called the land line phone at the

family's house at 4441 Baychester Avenue.  (Tr. 1680.)  She said

that she spoke with defendant.  This was fairly significant

evidence, even though the shooting had occurred prior to the 1:28

p.m. call to 911, and the victim had been bleeding for quite some

time before that.  Tameka was a graduate of the John Jay College

of Criminal Justice.  (Tr. 968.)  Moreover, she gave the

following cogent explanation as to why she telephoned defendant.

About two hours earlier, he drove her to a friend's house so that the friend could drive her to a July 4 barbecue on Long Island. At 1:32 p.m., she was calling defendant to advise him that she had reached the Long Island destination but that no barbecue was going on.  She testified that he replied that a barbecue would be held at the home of his brother-in-law, Lenox Alcott. (Tr. 973-79.)


Ground 2: Prosecutorial misconduct

During cross examinations, the prosecutor asked the first four defense witnesses some questions about a "barbecue" or "cookout" at 4441 Baychester Avenue.  Ground 2 asserts that this amounted to prosecutorial misconduct.  This assertion is baseless, as can be seen by simply reading the questions.

The misconduct allegedly began during the cross of the first defense witness, Tameka:

> PROSECUTOR: Ms. Byfield, let me understand.  On the Fourth of July, at about 1:30 in the afternoon, you were not at a barbecue or an outing or gathering of people at your mother's house on Baychester Avenue; is that right?
>
> TAMEKA BYFIELD: No.
>
> PROSECUTOR: And, as far as you know, there was no such barbecue going on at her house that day; is that right?
>
> TAMEKA BYFIELD: Right.  (Tr. 999.)
>
> *          *          *

PROSECUTOR: Did you speak to your parents about what had happened on July 4th of 2000?

TAMEKA BYFIELD: Yes.

PROSECUTOR: Did they ever tell you that they were at a barbecue at their house on Baychester with your brother at about 1:30 in the afternoon that day?

TAMEKA BYFIELD: No, they didn't.

PROSECUTOR: As far as you know, they were not there with him at 1:30 in the afternoon that day?

MR. METZ: Objection.

THE COURT: Sustained.

(Tr. 1031-32.)  Mr. Metz's successful objection eliminated the last question, but not the previous question.  According to Mr. Hamlin, that previous question falsely implied that the parents had once made a false exculpatory statement that a barbecue occurred at their house on the afternoon in question.  Yet Tameka calmly answered "No, they didn't."  The prosecutor scored no point on this topic.

The second defense witness was defendant's father, Lexis. Mr. Hamlin contends that the following two questions were prejudicial:

`          PROSECUTOR: Okay.  That day, is there any kind of celebration or gathering at your house?

LEXIS BYFIELD: No. No.

PROSECUTOR: None whatsoever?

LEXIS BYFIELD: No.

– 11 –

(Tr. 1078-79.)

The third defense witness was defendant's mother, Gloria. Mr. Hamlin contends that the following questions were prejudicial:

> PROSECUTOR: Did you ever tell anyone that there was a cook-out at your house on the 4th of July at about 1:30 in the afternoon?
>
> GLORIA BYFIELD: No.
>
> PROSECUTOR: And did you ever -- were you ever expecting to come into court and give testimony about being with Donovan at a cook-out at your house on the 4th of July at about 1:30 in the afternoon?
>
> GLORIA BYFIELD: No.
>
> PROSECUTOR: That was never discussed with any attorney?
>
> GLORIA BYFIELD: No.

(Tr. 1148-49.)

The prosecutor talked more about the attorney when she cross-examined the fourth defense witness, the defendant's wife, Jacqueline:

> PROSECUTOR: Did there come a point in time when you told anyone that you were indeed with your husband at the time this crime took place?
>
> JACQUELINE BYFIELD: Yes.
>
> PROSECUTOR: And at that point in time did you indicate that in addition to yourself being present, other members of his family, his mother, his father, his sister, were all present with your husband at home for a cook-out on the 4th of July?
>
> JACQUELINE BYFIELD: No.  We didn't have a cook-out that

– 12 –

day.

PROSECUTOR: Excuse me?

JACQUELINE BYFIELD: We didn't have a cook-out that day.

PROSECUTOR: Did you ever talk to a lawyer about that? Did you ever tell a lawyer that? Did you tell anyone that?

JACQUELINE BYFIELD: About a cook-out?

PROSECUTOR: Yes.

JACQUELINE BYFIELD: No.

PROSECUTOR: Did you tell anyone that all of you were with Mr. -- your husband on the 4th of July at the time of the crime?

JACQUELINE BYFIELD: Yes.

PROSECUTOR: You did?

JACQUELINE BYFIELD: Yes.

PROSECUTOR: And was that true?

JACQUELINE BYFIELD: Yes.

PROSECUTOR: Now, let me just make sure we understand one another. At a different point in time did you say: I was with Donovan Byfield, his mother, his father, his sister, all of us were with him on 4th of July so he couldn't have done the crime?

MR. METZ: Objection. I think we need to break it down.

THE COURT: Overruled.

PROSECUTOR: Did you?

JACQUELINE BYFIELD: Yes. When I spoke to the lawyer.

PROSECUTOR: Okay. And do you know whether other members of his family, the people I just mentioned to you, his mother, father, sister, was everyone present at that time, or were you there alone?

JACQUELINE BYFIELD: I wasn't there alone.  It was me, and his mother, and his father went to see the lawyer.

PROSECUTOR: Okay.  And are they in the room when you're speaking about this with the lawyer?

JACQUELINE BYFIELD: Yes.  All of us, we was present in the room.

PROSECUTOR: And was everyone saying -- were they in agreement with you that everyone was together with this defendant at the time that this crime was committed and, therefore, he could not have done it?

JACQUELINE BYFIELD: No.  No.  They didn't say that they were there at the time the crime was committed.  They said they were there at home.  I was there at the time in question when the crime was committed.  Me, the kids and his father was at home.

PROSECUTOR: What I'm saying to you is that day, was there a discussion that at the time and date of this crime, that everyone was present at your home having a cook-out on the 4th of July when this crime happened?

MR. METZ: Objection.

PROSECUTOR: Everyone was there together?

JACQUELINE BYFIELD: No.

MR. METZ: Objection asked and answered.

THE COURT: Overruled.

JACQUELINE BYFIELD: No.

(Tr. 1227-30.)

Reading the transcript, it is hard to see how those questions and answers hurt the defense in any way.  Mr. Metz, who strikes me throughout the transcript as a highly competent attorney, did not object to those questions (except to note

technical objections such as "asked and answered" or the need to break down a compound question).

The next morning, outside the presence of the jury, Mr. Metz (Tr. 1260-61) and Justice Fisch (Tr. 1265) quickly got ADA Yaremko to concede that the Notice of Alibi had mentioned nothing about a cookout.  At least implicitly, Mr. Hamlin faults Mr. Metz for not requesting that this concession be conveyed to the jury. After Tr. 1265, ADA Yaremko never again referred to any cookout or barbecue at defendant's family home -- not during her cross examinations of the final alibi witness (Tr. 1359-96) and of defendant (Tr. 1496-1608), and not during her summation (Tr. 1709-78).  Nonetheless, Mr. Hamlin speculates that some jurors may have received the erroneous impression that the Notice of Alibi had asserted that defendant had participated in a family cookout at the time of the shooting.  On the contrary, any such impression would have been demolished by a quick reading of the Notice of Alibi -- which was placed into evidence at Tr. 1332, and is now annexed to my Report.  Ironically, Mr. Hamlin's Ground 3 complains that the judge allowed the jury to see the Notice of Alibi.

As for Ground 2, it is based on hyperbole.  For example, Mr. Hamlin's 8/23/06 memorandum of law, at page 28, says: "All of petitioner's relatives ... were hammered with questions relating to an apocryphal cook-out."  In my view, the four witnesses

handled the "cookout" questions easily (Tr. 999, 1031-32, 1078-79, 1148-49, 1227-30), and those portions of the cross-examinations accomplished little or nothing for the prosecution. I find that it was entirely reasonable for Mr. Metz not to make any more objections than he did.

Still at page 28, Mr. Hamlin's memorandum says: "All along she knew that the implications were false, and that there was no evidence of a prior cookout statement ... The prosecutor's conduct was deliberate and calculated."  It seems to me that ADA Yaremko's main concern was whether defendant had attended some sort of family gathering; whether it was a cookout was a matter of slight importance.  Her very first question of cross-examination asked whether the witness had attended "a barbecue or an outing or a gathering of people" at the family house.  (Tr. 999.)  Later, during a robing room conference, she conceded that the Notice of Alibi said nothing about a cookout.  (Tr. 1265.) It also said nothing specific about a gathering of people, but that was a natural question to ask since the Notice said that four family members and a friend could all testify that defendant was "[i]nside and in front of" the family house on July 4.

I see no basis for characterizing the "cookout" questions as "prosecutorial misconduct."  Certainly Ground 2 does not meet the high standard for a constitutional violation, which would occur only if the prosecutor's questions "so infected the trial with

unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).


        Ground 3:

        Ground 3 complains about the fact that Justice Fisch took four actions:

        A. Receiving the Notice of Alibi as an exhibit in evidence.

        B. Telling the jury that the Notice was introduced as "evidence of inconsistencies".  (Mr. Metz did not object to this.)

        C. Permitting the prosecutor to recall defendant's mother for further cross examination.

        D. In the instruction on alibi testimony, naming only three of the witnesses.  (Mr. Metz did not object to this.)

(8/23/06 Pet. Memo. at pp. 38-41; 5/24/07 Reply at ¶¶ 7-11.)  All of those complaints raise issues of state law.  They could only rise to the level of a federal constitutional violation if they were so severe as to deny due process of law.


        A. Receiving the Alibi Notice as an exhibit in evidence

        ADA Yaremko made a robing-room request to put the Notice of Alibi into evidence.  Her first request came at Tr. 1211-15, after three defense witnesses had testified and been excused -- defendant's sister Tameka, defendant's father Lexis, and defendant's mother Gloria.   The prosecutor asserted that the Notice had alleged "that each of the individuals ... were present

– 17 –

with the defendant ... at the time of the crime."  Apparently referring to the testimony that Tameka and Lexis had not been in the same place at the time of the homicide, and that Gloria had been at work, ADA Yaremko said: "I would like to have the alibi notice itself introduced.  I would like to, at the very least, explore the issue with them [as to] when they changed their position [story]."  Mr. Metz replied: "They never did."  (Tr. 1211.)  Nevertheless, Justice Fisch told ADA Yaremko: "You have a good-faith basis to ask the questions."  (Tr. 1215.)

The next morning, before the resumption of the cross of defendant's wife, the judge held another robing-room conference and ADA Yaremko again sought to put the Notice of Alibi into evidence.

At Tr. 1257, she cited *People v. White*, 228 A.D.2d 209 (1st Dep't 1996).  Mr. Metz replied at Tr. 1259-61:

> My position is I'm fully aware of *People v. White* and I'm fully aware of the fact there's a split in authority on this issue between the departments.
> Obviously I would prefer to embrace the Second Department on this where they say you can't use [a notice of alibi as a People's exhibit] --

> \*                 \*                 \*

> In any event however, *White* has no application to this case and I'll tell you why.

> \*                 \*                 \*

> The problem with Ms. Yaremko's application in this case is that the notice of alibi is consistent with the testimony of the witnesses.

                    *              *              *

        Ms. Yaremko asked I think every witness, isn't it true
   that you were at a cook out on July 4, 2000, at 4441
   Baychester?
        As your honor is well aware in the Criminal Procedure
   Law 250.20 doesn't require notice to indicate **what** you were
   doing at the time, ... (Emphasis added.)


   The judge agreed that the Notice of Alibi had not promised

any evidence of a cookout.  (Tr. 1265.)  On the other hand, he

said: "[A]ccording to this alibi notice she [defendant's mother]

was purportedly a witness who was prepared to testify at trial

that the defendant was at [4441] Baychester Avenue at the time

the crime was committed."  (Tr. 1268-69.)  But the mother had

testified that she was at work at the time of the crime, and she

only got home around 1:50 p.m.  Hence, the judge found that "her

testimony is inconsistent with the alibi notice" and therefore he

permitted the prosecutor to recall the mother to the stand for

further questioning on that inconsistency.  (Tr. 1269-70.)

    The prosecutor tried to persuade the judge to make the same

ruling as to Tameka.  (Tr. 1269, 1272.)  But Mr. Metz won this

round.  He had orally added Tameka as a witness (see 7/2/01 Tr.

29-31), and he now represented: "I never said to anybody that

Tameka Byfield was at 4441 Baychester Avenue."  (Tr. 1272.)  The

judge immediately accepted that representation and denied the

prosecutor's request to recall Tameka.  (Tr. 1272-73.)

    Defendant's mother made her second appearance on the witness

stand at Tr. 1313-39.  Beginning at Tr. 1319, she was asked
whether Robert Kramer (the attorney who prepared the Notice of
Alibi) had ever spoken with her about her whereabouts on the day
of the crime.  She answered at Tr. 1321-22:

> GLORIA BYFIELD: Yes, I speak to Mr. Kramer, but at the
> time I don't recall telling Mr. Kramer where I was.  If he
> asked me, I said I was at work; but the time factor -- we
> did not - - I told him I went to work and I come on back,
> but the time, I don't recall.  I don't recall telling him
> what time because I was not - - I didn't know that I was
> going to be sitting as a witness.  I didn't know anything
> about it.

> PROSECUTOR: Do you remember Mr. Kramer ever asking you
> if you were there at about 1:30 in the afternoon, on the
> Fourth of July, with your son?

> GLORIA BYFIELD: If Mr. Kramer asked me if I was there
> about 1:30, the answer to Mr. Kramer would be no, because at
> 1:30 I was not there.

> PROSECUTOR: So, then you never told Mr. Kramer or
> anyone that you were with your son --

> GLORIA BYFIELD: Not that I --

> PROSECUTOR: -- at the time of this crime?

> GLORIA BYFIELD: Not that I recall.  Because at the time
> when this crime supposedly to happen, I was at work.

In the robing room, Justice Fisch found that the prosecutor
had "elicited from this witness testimony that she told the
attorney that she was at work at 1:30 on July 4th."  (Tr. 1322-
1323.)  This finding was not unreasonable, even though the
testimony was vaguer.  The witness did at one point testify, "I
told him I went to work," although she was less certain about

whether they had discussed the time:  "I don't recall telling him
what time because I was not -- I didn't know that I was going to
be sitting as a witness. ... If Mr. Kramer asked me if I was
there [at home] about 1:30, the answer to Mr. Kramer would be no
..."  (Tr. 1321.)  Over objection, the judge ruled that he would
permit the prosecutor to introduce the Notice of Alibi that had
been filed by Mr. Kramer.  (Tr. 1322-1327.)

Three years after the trial, the New York Court of Appeals
issued a 4-3 decision concerning the legislative intent behind
New York's alibi statute, CPL §250.20.  The narrow majority ruled
that, if a trial judge finds that an alibi witness's testimony is
inconsistent with the Notice of Alibi, the judge nevertheless
lacks power to allow the jury to see the Notice of Alibi.
Instead, the judge must restrict himself to the two options
listed in §250.20: (a) grant an adjournment to allow the
prosecution to investigate, or (b) strike the witness's
testimony.  *People v. Rodriguez*, 3 N.Y.3d 462, 468 (Ct. App.
2004).

The *Rodriguez* decision reversed the First Department.  The
high court's decision came down shortly after Mr. Hamlin and ADA
Nguyen had briefed the issue to the First Department in the case
at bar.  Naturally, Mr. Hamlin proceeded to mention the Court of
Appeals decision in a reply brief to the Appellate Division.

The Appellate Division essentially ruled that (a) Justice

Fisch had correctly applied the law of the First Department as it
stood at the time of the trial, and (b) if *Rodriguez*
retroactively called this an error, then such error was harmless
in Byfield's case:

> The court properly exercised its discretion in
> permitting the People to cross-examine a defense witness as
> to whether she was the source of certain information
> contained in defendant's alibi notice, as well as in
> receiving the alibi notice as an informal judicial admission
> that was contrary to defendant's position at trial (*see
> People v. White*, 228 A.D.2d 209, 644 N.Y.S.2d 16 [1996].
> Defendant's remaining contentions relating to his alibi
> defense are unpreserved and we decline to reach them in the
> interest of justice.  Were we to find any error with respect
> to the alibi defense, either based upon the concerns
> articulated in *People v. Rodriguez* or otherwise, we would
> find such error to be harmless in view of the overwhelming
> evidence connecting defendant with the commission of this
> crime.

*People v. Byfield*, 15 A.D.3d 262, 790 N.Y.S.2d 434 (1st Dep't
2005).

I find that the defense was not harmed by the judge's
allowing the jury to see the alibi notice.  The notice, served at
an early stage, was entirely consistent with the defense
testimony, except to the extent that the notice implied that
Gloria Byfield was actually home with defendant at the alleged
time of the homicide.  That small defect paled into
insignificance when compared to the jury's main task, which was
to evaluate the credibility of defendant's testimony in the light
of all the evidence.

###### B. Telling the jury that the Notice was introduced as "evidence of inconsistencies"

Toward the end of Mr. Metz's defense summation he said:

    DEFENSE COUNSEL: Now, Miss Yaremko may tell you about an alibi notice that was given in this case which is a piece of paper which is filed by an attorney and on that alibi notice it lists Gloria Byfield as being one of the witnesses who will testify as an alibi.  Now, was Gloria Byfield with Donovan Byfield at precisely 1:30?  No.  But she was there about twenty minutes later.  And when Miss Yaremko confronted her with that document, what did she say?  She said, when I talked to the lawyer, I told him I was at work at 1:30.  Now folks, if the lawyer who prepared that document decided to submit her as an alibi witness, I submit to you that absolutely has nothing to do with her credibility as a witness.  Why?  Because Miss Byfield didn't prepare that document or sign that document, ever saw that document.  That's a legal document not prepared by any of the people in the Byfield family who testified in this case. And the other interesting thing about that document if you look at it, it's stamped on the upper right hand corner, it indicates to you that all of that information, all that information, their names, where they say Donovan was, all of that was turned over to the Bronx District Attorney's Office early on in this case.

    Now, that document also lists two other names besides Gloria, Lexis, and Jackie, and Lenox Alcott.  It also lists Tamika and Novelette Bell.

    Novelette Bell did not testify.  Novelette actually lives in Florida.  She was up here ready to testify but could not.  She has a sick child.  But Novelette Bell is not technically an alibi.  She is not standing with Donovan Byfield at the time of this incident at 4441 Baychester Avenue.  She is an alibi witness to the extent that Tamika Byfield is, in that Tamika Byfield spoke to Donovan Byfield at 1:30 p.m. on the phone that day.  Now, if the lawyer who prepared that document back in October of 2000 made a judgment that Novelette Bell or Tamika Byfield is not technically an alibi witness because they're not standing with him, that's the lawyer's issue.

    PROSECUTOR: Objection.

    THE COURT: Sustained.

(Tr. 1695-96.)  Mr. Metz came close to suggesting that the alibi

notice was evidence that Ms. Bell would have testified that she spoke by phone with defendant at the time of the homicide.  This may be what prompted the judge to make the following comment to the jury right after Mr. Metz's summation:

> THE COURT: Mr. Metz discussed the alibi witness which was introduced into evidence as People's Exhibit Number 83. That was introduced into evidence not for the truth of the matter, but as evidence of inconsistencies between that statement and trial testimony of witnesses.

(Tr. 1707-08.)  In hindsight, the last part of that comment might have been better left unsaid, because the statements in the alibi notice were not explicitly inconsistent with any of the testimony of the defense witnesses.  However, the comment did not come close to depriving defendant of a fair trial.  The jury could look at the alibi notice, and could see that it was not inconsistent with the testimony of any defense witness, except to the extent that it implied that Gloria was actually home with defendant at the alleged time of the homicide.

### C. Permitting the prosecutor to recall Gloria Byfield for further cross-examination

When a judge permits a prosecutor to recall a defense witness for further cross-examination, there is no presumption that this prejudices the defense.  Mr. Hamlin does not point to any prejudice except that Gloria Byfield blurted out that she had bitter disputes with the first attorney, Mr Kramer:

> PROSECUTOR: You told Mr. Kramer when you spoke to him that you were at work when this crime occurred at

or about 1:30 in the afternoon on the 4th of July, 2000, is that right?

GLORIA BYFIELD: Yes.

PROSECUTOR: And that's from the very beginning?

GLORIA BYFIELD: I don't recall me and Mr. Kramer having this conversation.  But if we do have the conversation --

PROSECUTOR: I'm --

GLORIA BYFIELD: But if we do have the conversation --
I don't recall me and Mr. Kramer having this conversation -- but if we do, I will tell Mr. Kramer that I was at work.  If we do, it was at not time factor because did he not ask when the time because I wasn't on trial, and he has to talk to my son, not me.
Mr. Kramer -- I get Mr. Kramer as a lawyer to defend my son.  It happened I am a poor woman, and I had to put my home, you need a Legal Aid lawyer.  When I go back to Mr. Kramer, Mr. Kramer start to charge me more money, and because of that I threaten I will take him to the board.  So Mr. Kramer give all these false statements.
If I tell Mr. Kramer, Mr. Kramer not supposed to give it to you, supposed to give to the lawyer, not to you.

(Tr. 1327-28.)

The last sentence indicated that the mother did not realize that Mr. Kramer was legally obligated to supply alibi evidence to the prosecutor, not just to the new defense attorney.  Neither the judge nor the prosecutor can be blamed for a statement volunteered by the witness.  It was also unfortunate that the mother accused Mr. Kramer of giving "all these false statements," but this seemed to be referring only to the fee dispute.  The fee dispute was helpful to the defense in one sense: it gave an innocent reason why the communications between the mother and Mr.

Kramer may have been imperfect.

        D. In the instruction on alibi testimony, naming only
        three of the witnesses

In his instruction concerning alibi, Justice Fisch told the jury:

> THE COURT: In this case, the defense has presented
> testimony that the defendant was not present at 2175 Reeds
> Mill Lane on July 4, 2000, between 1:25 and 1:30 p.m.  The
> defense has called witnesses and presented testimony from
> Lex[i]s Byfield, Jacqueline Byfield, and Lenox Alcott that
> they were present with the defendant at 4441 Baychester
> Avenue at the time in question, are [on?] the basis of such
> testimony the defendant contends that he could not have
> committed any of the crimes charged.  The defense has
> presented what is commonly known as an alibi.  You must
> consider and evaluate the testimony and credibility of the
> alibi witnesses who testifies just as you would the
> testimony of any other witness.  If the alibi testimony
> creates a reasonable doubt in your mind that the defendant
> is the person who committed each of the crimes charged, you
> must find him not guilty.  It follows, therefore, that the
> People must disprove the alibi to your satisfaction beyond a
> reasonable doubt.  I instruct you further that defendant has
> no burden to prove that he is not the person who committed
> the crime.  Burden is on the People to prove that he is the
> person who in fact committed the crime.

(Tr. 1797-98.)  Mr. Metz did not object to that instruction, but

Mr. Hamlin does.  In an excess of zeal, Mr. Hamlin uses quotation

marks when in fact he is making an overstated paraphrase:

> 11. The court's charge dealt the final blow to the
> alibi defense.  It instructed the jury that the testimony of
> "Lexis Byfield, Jacqueline Byfield, and Lennox Alcott were
> the only testimonies they should consider because their
> presence with [Petitioner] was the basis that he could not
> have committed the crimes charged, and form an alibi the
> People must disprove."  In essence the jury had been
> instructed that the testimony of both Gloria and Tameka
> Byfield was not only inconsistent with the original notice

of alibi but incredible and should therefore be disregarded.

(Pet. Reply p. 4.)

In fact, Lexis Byfield, Jacqueline Byfield, and Lenox Alcott were the only witnesses who testified "that they were present with the defendant at 4441 Baychester Avenue at the time in question."  The judge did not tell the jury that those three witnesses were the **only** alibi witnesses, and he certainly did not say that the testimony of Gloria or Tameka was incredible or ought to be disregarded.

Mr. Hamlin makes similar overstatements in his main brief. At page 39, he talks about "[t]he trial court's exclusion of Tameka and Gloria Byfield as alibi witnesses," but of course they were not excluded and the jury heard their testimony.  Also at page 39, Mr. Hamlin asserts that the judge "cut Gloria and Tameka Byfield off the alibi list," but in fact the jury saw the alibi list and Gloria was on it.  (Tameka was not on the written list, but that was because the defense added her much later, with an oral application.)

I find it highly unlikely that the jury's verdict was affected by the fact that the judge chose to omit Gloria and Tameka when naming the "alibi" witnesses.

CONCLUSION AND RECOMMENDATION

For the reasons stated above, I recommend that Judge Daniels

deny Donovan Byfield's habeas corpus petition.

Pursuant to 28 U.S.C. §636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, any party may object to this recommendation within 10 business days after being served with a copy (i.e. no later than August 10, 2007), by filing written objections with the Clerk of the U.S. District Court and mailing copies (a) to the opposing party, (b) to the Hon. George B. Daniels, U.S.D.J. at Room 630, 500 Pearl Street, New York, NY 10007 and (c) to me at Room 1360, 500 Pearl Street.  Failure to file objections within 10 business days will preclude appellate review.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam); 28 U.S.C. §636(b)(1); Fed.R.Civ.P. 72, 6(a), and 6(e). Any request for an extension of time must be addressed to Judge Daniels.

DOUGLAS F. EATON
United States Magistrate Judge
Room 1360, U.S. Courthouse
500 Pearl Street
New York, NY 10007

Dated:    New York, New York
          July 24, 2007

Copies of this Report and Recommendation (and of the Notice of Alibi) are being mailed to:

- 28 -

Edward Hamlin, Esq.
16 Burning Tree Drive
Newburgh, New York 12550

Donovan Byfield
Inmate # 01A6586
Attica Correctional Facility
P.O. Box 149
Attica, New York 14011-0149

Rither Alabre, Esq.
Assistant District Attorney
198 East 161 Street
Bronx, New York 10451

Hon. George B. Daniels
Room 630, U.S. Courthouse
500 Pearl Street
New York, New York 10007

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF THE BRONX
------------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,

                 -against-

**DONOVAN BYFIELD,**

                      Defendant.
------------------------------------------------------------------X

**NOTICE OF ALIBI**

**Ind. No.: 4363/2000**

**RECEIVED**

OCT 5 2000

SUPREME COURT CLERK'S OFFICE
BRONX COUNTY

**SIRS:**

      **PLEASE TAKE NOTICE** that upon the trial of the above captioned matter, the defendant will present evidence that he was at a place other than as alleged in the Indictment as follows:

### PLACE WHERE DEFENDANT WAS WHEN CRIME WAS ALLEGEDLY COMMITTED:

1.    Inside and in front of:      4441 Baychester Ave.
                                      Bronx, New York 10466

### INFORMATION CONCERNING ALIBI WITNESSES:

| | Name: | Relationship: | Employment: |
|---|---|---|---|
| 2. | Gloria Byfield | Defendant's Mother | Hebrew Home for Aged Bronx., N.Y. |
| | Lexis Byfield | Defendant's Father | Jacobi Hospital Bronx, N.Y. |
| | Jacqueline Byfield | Defendant's Wife | Unemployed |
| | All of above residing at: | 4441 Baychester Ave. Bronx, New York 10466 | |
| | Lenox Allcott 3254 Cortsa Ave. Bronx, New York | Defendant's Brother-in-Law | Top Carpet Bruckner Blvd. Bronx, N.Y. |
| | Novelette Bell 1001 E. 241 St. Bronx, New York | Friend | To be supplied |

1